## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

SANDRA HAYWARD,

      Plaintiff,                                Case No.

v.                                            Hon.

PINECREST MEDICAL
CARE FACILITY,

      Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
*Attorneys for Claimant*
340 Beakes St., Suite 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

---

There is no other pending or resolved civil action arising out
of this transaction or occurrence alleged in the Complaint

## COMPLAINT AND JURY DEMAND

      Plaintiff Sandra Hayward ("Plaintiff"), by and through her attorneys, HURWITZ LAW PLLC, brings this action against Defendant Pinecrest Medical Care Facility ("Defendant") and hereby alleges as follows:

## INTRODUCTION

      1.      This is an action for unlawful age discrimination and unpaid wages in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, Michigan's Elliott-Larsen Civil Rights Act (the "ELCRA"), MCL §. 37.2101, *et seq.*, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*  After 42 years of exemplary service, Plaintiff

was systematically pushed out of her Human Resources Director position by new management who favored younger employees.  Defendant replaced Plaintiff's responsibilities with a 32-year-old employee months before her termination, subjected her to unprecedented micromanagement and exclusion, and ultimately fired her at age 60.  When questioned about the termination, Defendant's Administrator admitted she thought Plaintiff "would be able to retire" and stated Defendant wanted to "get rid of [her] sooner"—directly revealing age-based animus.  Defendant also violated federal wage laws by misclassifying Plaintiff as exempt while controlling her schedule and docking her pay.

## PARTIES AND JURISDICTION

2.      Plaintiff Sandra Hayward is an individual residing in Hermansville, Menominee County, Michigan.

3.      Pinecrest Medical Care Facility is a non-profit medical care facility located in Powers, Menominee County, Michigan.

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction for claims arising under the ADEA, 29 U.S.C. § 621, *et seq*., and the FLSA, 29 U.S.C. § 201, *et seq*.) and supplemental jurisdiction under 28 U.S.C. § 1367 for Plaintiff's ELCRA claim.

5.      Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in this District and the events giving rise to this action occurred in this District.

6.      Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 16, 2025.

## FACTUAL ALLEGATIONS

### Background and Employment History

7.      Defendant operates a long-term medical care facility providing health and recovery services to Michigan residents.

8.      Plaintiff began working for Defendant on August 2, 1982—over 42 years of dedicated service.

9.      Plaintiff served as Human Resources Director from May 2, 2016, through her termination on January 15, 2025.

10.     Throughout her 42-year tenure, Plaintiff never received a negative performance review or disciplinary action.

11.     Plaintiff's most recent performance evaluation in 2018 rated her 3.6 out of 4.5— "Exceeds Standards."

12.     Her supervisor commented: "Sandy is an invaluable employee who takes her responsibilities seriously.  She wears many hats and has to constantly juggle her time to accomplish her duties.  Thank you, Sandy, for all your hard work!"

13.     Individual performance categories praised Plaintiff's work: "Sandy has a long list of her duties performed. . . She does her duties competently and has few errors that I've seen" and "I have had no issues with the quality of her work."

14.     At the time of the events described herein and her termination, Plaintiff was 60-years-old and approaching retirement eligibility.

### New Management and Age-Based Discriminatory Treatment Begins

15.     In July 2023, Defendant hired Steven Dubod as Chief Financial Officer.

16.    Mr.  Dubord  immediately  began  undermining  Plaintiff's  authority  and demonstrating preferential treatment towards younger employees.

17.    Plaintiff was originally scheduled to lead orientation onboarding meetings as a core HR function; instead, Mr. Dubord took over these meetings, stating he "wasn't picking on [Plaintiff], but [he] was going to use Human Resources as an example."

18.    On August 1, 2023, during an onboarding meeting attended by multiple coworkers and IT staff, Mr. Dubord discretely handed Plaintiff papers at the end of the meeting.  These papers were a Performance Improvement Plan ("PIP").

19.    Plaintiff later discovered Mr. Dubord had emailed her PIP to her coworkers prior to the meeting—before she had even been informed of it herself.

20.    At no point did Mr. Dubord nor anyone else provide Plaintiff with an explanation for why she was being placed on a PIP despite 42 years of exemplary service and no prior performance issues.

21.    The PIP was never signed, never formally implemented, and had no legitimate basis.

22.    When Plaintiff approached Administrator Dana Smith for clarification, Ms. Smith admitted Mr. Dubord discussed the PIP with her but stated she had not approved it.

23.    When Plaintiff confirmed she would try her best to complete the tasks, Ms. Smith stated "just do what you can"—acknowledging the PIP's questionable nature.

24.    Prior to issuing a PIP, Defendant's standard practice required supervisors to engage in verbal counseling and supervisory discussions with the employee to address performance concerns and provide opportunity for correction.

25.     Mr. Dubord never engaged in any supervisory discussion, verbal counseling, or written warnings with Plaintiff regarding alleged performance deficiencies before issuing the PIP on August 1, 2023.

26.     By bypassing all preliminary steps of progressive discipline and immediately issuing a PIP without any prior supervisory discussions, verbal warnings, or written warnings, Mr. Dubord deviated from Defendant's standard employment practices.

27.     Upon information and belief, younger employees who experienced performance concerns were provided verbal counseling and supervisory discussions consistent with Defendant's progressive discipline framework before receiving any formal disciplinary action.

28.     Mr. Dubord demonstrated preference for younger employees over Plaintiff.

29.     For example, he reduced Emily Scheriff's health insurance premium to 50% of what she should have been paying—directly infringing on Plaintiff's HR responsibilities—without informing Plaintiff.

30.     When Plaintiff questioned Ms. Scheriff about the discrepancy, Ms. Scheriff expressed surprise, stating that she assumed Plaintiff was aware.

31.     When Plaintiff brought this breach of protocol to Ms. Smith's attention, explaining that Mr. Dubord had removed her job duty without notice, Ms. Smith dismissed her concerns and stated there was nothing she could do about it.

32.     Plaintiff filed a formal written complaint regarding Mr. Dubord's conduct with Ms. Smith on August 8, 2023.  The complaint outlined Mr. Dubord's clear targeting of her and the inappropriate handling of her PIP and stated the following:

> Giving a PIP in a meeting that was supposed to be On-Boarding.  ***There were other co-workers including IT at the meeting which was very misleading, harassing, humiliating and defamation of character to myself.  Steve has been making comments to me that the duties and responsibilities I have been doing are not***

*correct and are wrong without explaining what I am doing wrong*. Questioning FMLA and contacting attorney to find I am doing it correct, insurance premiums are not being done correctly so I followed up with our agent and they are correct, then turned and said there are no two management alike and there is no consistency. *The PIP was not given to me until I went to leave the meeting after 2 hours. Steve stated that he emailed it to the other people and IT just prior to the meeting*. Steve's actions were very unprofessional and put out very bad overview of myself which will be hard to repair, especially when he is the CFO and is not my supervisor.

33.    Ms. Smith scheduled a meeting with Mr. Dubord and Plaintiff to discuss the complaint.

34.    During the meeting, Plaintiff reiterated everything that had happened and expressed that she expected an apology for the humiliation Mr. Dubord caused.

35.    Mr. Dubord refused to apologize or rescind the PIP.

36.    At the end of the meeting, Ms. Smith gave Mr. Dubord the complaint, which he never returned.

37.    Plaintiff never received a written response to her complaint.

38.    Mr. Dubord refused to interact with Plaintiff from this point forward.

39.    Shortly after Plaintiff filed a formal employee complaint about Mr. Dubord's conduct on August 8, 2023, Plaintiff learned from a coworker that Mr. Dubord had begun interviewing candidates to replace her.

40.    Mr. Dubord then extended a job offer to an applicant for Plaintiff's position, but the applicant declined.

41.    Throughout his tenure, Mr. Dubord systematically undermined Plaintiff's authority and made decisions within Plaintiff's scope of responsibility without informing her, yet falsely accused Plaintiff of performing her duties incorrectly.

42.     In his August 1, 2023 verbal criticisms and subsequent conduct, Mr. Dubord questioned whether Plaintiff was handling FMLA matters correctly.

43.     Concerned by these accusations, Plaintiff contacted an attorney to verify her FMLA procedures.  The attorney confirmed Plaintiff was handling FMLA in full compliance with federal law.

44.     Mr. Dubord also questioned whether Plaintiff was calculating insurance premiums correctly.

45.     Plaintiff followed up directly with Defendant's insurance agent and confirmed her calculations were correct.

46.     Despite questioning Plaintiff's competence, Mr. Dubord himself made several significant errors during his tenure that Defendant would later attempt to attribute to Plaintiff or cite as grounds for her suspension and termination.

47.     In approximately July-August 2023, Mr. Dubord unilaterally reduced employee Emily Scheriff's health insurance premium to 50% of what she should have been paying—directly infringing on Plaintiff's HR responsibilities.

48.     Mr. Dubord made this unauthorized adjustment without informing Plaintiff, despite it being her responsibility.

49.     Plaintiff did not discover this improper adjustment until the end of 2023 when she began preparing 2024 insurance deductions.

50.     When Plaintiff questioned Ms. Scheriff about the discrepancy, Ms. Scheriff expressed surprise and stated she assumed Plaintiff was aware of the change, not knowing Mr. Dubord had acted unilaterally.

51.     Plaintiff immediately brought this to Ms. Smith's attention, explaining that Mr. Dubord had usurped her job duty without notice and undermined her authority.

52.     Despite this violation of proper procedures and infringement on Plaintiff's responsibilities, Ms. Smith dismissed Plaintiff's concerns and stated there was nothing she could do about it.

53.     This incident demonstrated both Mr. Dubord's preferential treatment of a younger employee, Ms. Scheriff and his pattern of excluding Plaintiff from decisions within her own job responsibilities.

54.     On or about December 15, 2023, Mr. Dubord approved a $2 per hour wage increase for Ms. Scheriff without Ms. Smith's knowledge or authorization.

55.     Mr. Dubord obtained Ms. Smith's signature through deception by inserting the wage increase onto a job description form and presenting it to Ms. Smith for signature without disclosing the embedded compensation change.

56.     When Plaintiff discovered the wage increase and informed Ms. Smith via text message on December 15, 2023, stating "Emily has a wage increase," Ms. Smith responded, "Really to what?"—demonstrating she had no knowledge of the increase.

57.     Plaintiff replied "$2 more per hour he said you approved," to which Ms. Smith responded, "omg, I did not, we never ever talked about wage."

58.     Ms. Smith then stated: "My god I wondered why he had me sign it, I told him I usually don't sign there" and "I will never do that again, what is he trying to do."

59.     Ms. Smith confirmed that the wage increase language "was not on there" when she signed it, indicating Mr. Dubord altered the document after obtaining her signature or misrepresenting its contents.

60.     This incident demonstrates Mr. Dubord's pattern of: (a) making unauthorized compensation decisions; (b) circumventing established approval procedures; (c) excluding Plaintiff from wage and compensation administration decisions within her purview; and (d) showing preferential treatment to Ms. Scheriff.

61.     During Licensed Practical Nurse ("LPN") contract negotiations in 2023, Defendant's retirement contribution structure for LPNs changed from a 35% match on employee contributions to 4.5% of yearly gross earnings.

62.     Mr. Dubord was responsible for implementing the new LPN retirement plan structure in Defendant's payroll and retirement systems.

63.     Mr. Dubord incorrectly set up the LPN retirement plan, failing to properly calculate or input the 4.5% of yearly gross earnings formula.

64.     When Plaintiff questioned Mr. Dubord about the retirement setup and raised concerns that it appeared incorrect, Mr. Dubord stated it was accurate and dismissed her concerns.

65.     Plaintiff recognized the error and attempted to correct Mr. Dubord's mistake multiple times, but Mr. Dubord overrode her corrections and insisted his setup was correct.

66.     Mr. Dubord left Defendant in or about April 2024, leaving behind the uncorrected retirement calculation errors he had created and which he had prevented Plaintiff from fixing.

67.     After Mr. Dubord's departure, when Defendant suspended Plaintiff on January 14, 2025, one of only three reasons cited in the suspension letter was "Retirement for LPN not accurate."

68.     Defendant blamed Plaintiff for an error created by Mr. Dubord—an error Plaintiff had identified, attempted to correct, but was prevented from fixing by Mr. Dubord himself.

69.     After Mr. Dubord departed Defendant in April 2024, the discriminatory campaign against Plaintiff that Mr. Dubord initiated continued seamlessly under new Controller Brooke Ponchaud, who arrived in May 2024 and immediately adopted similar tactics of micromanagement, exclusion, and systematic transfer of Plaintiff's duties to younger employees.

70.     The continuity of discriminatory treatment from Mr. Dubord's tenure through Ms. Ponchaud's tenure demonstrates an institutional pattern of age-based animus rather than isolated conduct by a single manager.

**Controller Brooke Ponchaud Continues Age-Based Discrimination**

71.     In May 2024, Defendant hired Brooke Ponchaud as Controller.

72.     Ms. Ponchaud, significantly younger than Plaintiff, immediately began micromanaging Plaintiff's work by establishing mandatory daily 8:00am meetings to review Plaintiff's tasks.

73.     This level of oversight was unprecedented and unnecessary given Plaintiff's decades of stellar performance reviews.

74.     Ms. Ponchaud did not subject younger employees to the same micromanagement or daily oversight.

75.     Ms. Ponchaud's efforts to push Plaintiff out involved the implementation of a new payroll system.  Specifically, she informed Plaintiff that Defendant was transitioning to an employee self-service payroll and HR system.

76.     Concerned about the implications for her role, Plaintiff directly asked Ms. Ponchaud whether she would still have a job once the system was implemented.  Ms. Ponchaud assured her that she would still have a job.

77.    Plaintiff also had responsibility for conducting interviews and disciplinary meetings for the Nursing Department with Yvonne Dunlap.

78.    On or about November 9, 2024, Ms. Dunlap scheduled a discipline meeting at 10:00 a.m., which Plaintiff approved as she had a meeting with Ms. Ponchaud at 11:00 a.m.

79.    Ms. Dunlap later rescheduled the meeting to 11:00 a.m., creating a scheduling conflict.

80.    Because discipline meetings were a central part of Plaintiff's job duties, she prioritized attending them and missed the meeting with Ms. Ponchaud.

81.    Ms. Ponchaud later called Plaintiff, criticizing her and insisting that she should have attended the rescheduled meeting—even at the expense of other job duties.

82.    Ms. Ponchaud had herself missed multiple trainings and was never criticized.

**Systematic Transfer of Duties to Younger Employees**

83.    In October 2024, Defendant announced implementation of a new payroll and HR system.

84.    Plaintiff began attending training meetings with Ms. Ponchaud and Jared Heino, an Executive Assistant in his early 30s.

85.    Upon information and belief, Mr. Heino was 32 years old at all relevant times.

86.    Plaintiff quickly noticed that HR topics—her core responsibilities—were rarely reviewed during these meetings.

87.    Beginning in or about October-November 2024, Plaintiff discovered Ms. Ponchaud and Mr. Heino were holding separate meetings about HR matters without Plaintiff's knowledge or invitation, despite these being Plaintiff's job responsibilities.

88.     By November 2024, Plaintiff observed Mr. Heino performing HR duties that had been assigned to her.  When Plaintiff questioned him, he casually responded "no problem, I just did it."

89.     In November 2024, the HR department began setting up biometric time clocks using fingerprint recognition.  Plaintiff was initially trained on the system while it was in the business office.

90.     In December 2024, the system was relocated to the basement and a password was added.  When Plaintiff asked Mr. Heino for the password, he stated he would give it to her later but never did.

91.     When Plaintiff informed Ms. Ponchaud she was unable to complete set-up without the password, Ms. Ponchaud dismissed her and responded that Plaintiff could figure it out on her own.

92.     On December 30, 2024, Plaintiff had a meeting with Ms. Ponchaud and Mr. Heino that needed to be continued the next day.  Because payroll information was due soon, Plaintiff requested to be informed when the meeting would be rescheduled.

93.     Plaintiff followed up with Ms. Ponchaud via text message, but Ms. Ponchaud claimed she had no updated.

94.     On January 2, 2025, when Plaintiff asked Mr. Heino about the meeting, he informed her it had already taken place without her knowledge or invitation.

95.     This systematic exclusion and transfer of Plaintiff's duties to Mr. Heino, a 32-year-old employee, demonstrates Defendant's intent to phase Plaintiff out and replace her with a significantly younger worker.

**Defendant's Unlawful Wage Practices**

96.     From August 2, 1982, through June 15, 2024, Plaintiff was classified as a non-exempt employee entitled to overtime pay.

97.     Prior to June 16, 2024, Plaintiff received overtime compensation for most pay periods she worked over 40 hours per week.

98.     On June 16, 2024, Defendant reclassified Plaintiff as an exempt employee.

99.     However, Defendant continued to treat Plaintiff as a non-exempt employee by: (a) controlling her work schedule; (b) docking her pay for partial-day absences; (c) preventing her from exercising discretion and independent judgment; (d) excluding her from wage and compensation decisions; and € forcing her to use vacation time to cover medical appointments.

100.    Plaintiff regularly worked over 40 hours per week after June 16, 2024, but received no overtime compensation.

101.    Defendant willfully deprived Plaintiff pay for all overtime hours worked after June 16, 2024.

102.    Defendant's treatment of Plaintiff forfeited any applicable overtime exemption.

**Suspension and Termination**

103.    On January 14, 2025, after a payroll meeting with Mr. Heino and Ms. Ponchaud, Ms. Ponchaud called Plaintiff into her office along with Emily Scheriff and Maintenance Supervisor David Vandermissen, Jr.

104.    Ms. Ponchaud informed Plaintiff she was being placed on a 3-day paid suspension and had to surrender her office keys.

105.    When Plaintiff questioned the reason, Ms. Ponchaud vaguely stated there were complaints from employees and vendors but refused to provide any specifics.

106.    The suspension letter cited: "Employees not signed up for insurance," "Vendors being held liable for Pinecrest mistakes," and "Retirement for LPN not accurate."

107.    The next day, January 15, 2025, Defendant terminated Plaintiff's employment.

108.    Defendant attempted to call Plaintiff at 11:59am and 12:43pm on January 15, 2025, but sent a termination letter via certified mail the same day stating only "At Will Employment" as the reason.

109.    After her termination, Ms. Smith told Plaintiff in a phone call that she thought Plaintiff "would be able to retire."

110.    Ms. Smith also stated Defendant "wanted to get rid of [her] sooner," then quickly corrected herself to say "later"—a clear effort to backtrack after revealing age-based animus.

111.    These statements directly evidence that Plaintiff's age and proximity to retirement were motivating factors in Defendant's decision to terminate her employment.

112.    Upon information and belief, immediately following Plaintiff's termination on January 15, 2025, Mr. Heino, age 32 at the time, assumed the HR Director role.

113.    Mr. Heino held the HR Director position for approximately three months before returning to his executive assistant position.

114.    Defendant subsequently hired a permanent HR Director at least 20 years younger than Plaintiff.

115.    The phased transfer of Plaintiff's responsibilities to Mr. Heino beginning in October-November 2024, combined with his immediate assumption of the HR Director role upon her termination, demonstrates Defendant's intent to replace Plaintiff with a significantly younger employee.

116.    Plaintiff had no history of discipline in 42 years of employment.

14

117.    Plaintiff consistently received positive performance reviews.

118.    Defendant's alleged reasons for termination lack credibility because (a) many of the alleged "errors" occurred due to decisions made by Mr. Dubord, who was no longer employed, or resulted from Defendant's own systemic failures; (b) Defendant excluded Plaintiff from meetings, denied her system passwords, and transferred her duties to Mr. Heino, then blamed her for being unable to perform those duties; and (c) In a January board meeting, Defendant claimed Plaintiff "had not been completing her job duties," but cited "misconduct" during an employment hearing, shifting justifications.

### COUNT I
### DISPARATE TREATMENT AGE DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

119.    Plaintiff incorporates the foregoing paragraphs by reference herein.

120.    At all relevant times, Defendant was Plaintiff's employer within the meaning of the ADEA and employed at least 20 employees.

121.    At all relevant times, Plaintiff was at least 40 years old and a member of the protected class under the ADEA.  At termination, Plaintiff was 60 years old.

122.    Plaintiff was qualified for her position as Human Resources Director, as demonstrated by her 42 years of service and consistent "Exceeds Standards" performance evaluations.

123.    Despite her qualifications and exemplary performance, Defendant subjected Plaintiff to adverse employment actions including micromanagement, exclusion from job duties, systematic transfer of responsibilities to a younger employee, and ultimately termination.

124.    Defendant treated similarly situated younger employees, including Brooke Ponchaud, Jared Heino, and Emily Scheriff, more favorably than Plaintiff.

125.    Defendant's decision to terminate Plaintiff was motivated by her age.

126.    But for Plaintiff's age, Defendant would not have subjected her to adverse employment actions or terminated her employment.

127.    Defendant's actions were willful and undertaken with reckless disregard for Plaintiff's federally protected rights.

128.    Plaintiff has suffered feelings of depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future, as a direct and proximate result of Defendant's discriminatory conduct.

129.    Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and will so suffer in the future; she has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future, as a direct and proximate result of the violation.

## COUNT II
## DISPARATE TREATMENT AGE DISCRIMINATION IN VIOLATION OF MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT

130.    Plaintiff incorporates the foregoing paragraphs by reference herein.

131.    At all relevant times, Defendant was Plaintiff's employer within the meaning of the ELCRA.

132.    The ELCRA prohibits employers from discriminating against employees based on age.

133.    At all relevant times, plaintiff was at least 40 years old.  At termination, Plaintiff was 60 years old.

134.    Plaintiff was qualified for her position and met or exceeded Defendant's legitimate expectations.

135.    Defendant subjected Plaintiff to different and less favorable terms and conditions of employment than younger employees, including micromanagement, exclusion from meetings and job duties, systematic transfer of responsibilities, and termination.

136.    Defendant's discriminatory treatment was based on Plaintiff's age.

137.    Defendant's conduct was willful and in reckless disregard of Plaintiff's rights under Michigan law.

138.    Plaintiff has suffered feelings of depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future, as a direct and proximate result of Defendant's discriminatory conduct.

139.    Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and will so suffer in the future; she has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future, as a direct and proximate result of the violation.

## COUNT III
## VIOLATION OF THE FAIR LABOR STANDARDS ACT

140.    Plaintiff incorporates the foregoing paragraphs by reference herein.

141.     At all relevant times, Defendant was an employer engaged in interstate commerce and/or the production of goods for interstate commerce within the meaning of the FLA, 29 U.S.C. § 203.

142.    At all relevant times, Plaintiff was an employee of Defendant within the meaning of the FLSA.

143.    The FLSA requires employers to pay non-exempt employees overtime compensation at one and one-half times the regular rate for all hours worked over 40 hours in a workweek.  29 U.S.C. § 207(a)(1).

144.    From August 2, 1982, through June 15, 2024, Plaintiff was classified as non-exempt and received overtime pay when she worked over 40 hours per week.

145.    On June 16, 2024, Defendant reclassified Plaintiff as exempt from overtime requirements.

146.    However, Defendant continued to treat Plaintiff as non-exempt by controlling her schedule, docking her pay for partial-day absences, and preventing her from exercising discretion and independent judgment in matters of significance.

147.    By docking Plaintiff's pay and denying her the salary basis of payment required for exempt status, Defendant forfeited any applicable overtime exemption.

148.    Plaintiff consistently worked more than 40 hours per week after June 16, 2024, but received no overtime compensation.

149.    Plaintiff worked outside of regularly scheduled shifts.

150.    In violation of the FLSA, Defendant failed to pay Plaintiff compensation or unpaid wages, compensable time, overtime, vacation time, and holiday pay.

151.    The "administrative exemption" under 29 C.F.R. § 541.202(a) does not apply because Plaintiff's primary duty did not include the exercise of discretion and independent judgment with respect to matters of significance.  Defendant systematically excluded Plaintiff from decision-making, denied her access to necessary systems and information, and transferred her responsibilities to others.

152.    The "learned professional exemption" under 29 C.F.R. § 541.301 does not apply because Plaintiff's work did not require advanced knowledge predominately intellectual in character or the consistent exercise of discretion and judgment.

153.    The foregoing conduct constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).  Defendant knew and/or showed reckless disregard for the fact that its compensation practices were in violation of these laws.

154.    By failing to maintain accurate records of Plaintiff's hours worked, Defendant violated 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2.

155.    As a direct and proximate result of Defendant's violations, Plaintiff has suffered and continues to suffer lost wages and other damages.

156.    Plaintiff is entitled to unpaid overtime wages, liquidated damages in an equal amount pursuant to 29 U.S.C. § 216(b), attorneys' fees, costs, and all other relief available under the FLSA.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant as follows:

A.    Judgment against Defendant in the amount of Plaintiff's unpaid back pay, front pay, compensatory damages, emotional distress, punitive damages, and attorney fees under the ADEA, ELCRA, and the FLSA;

B.    Pre-judgment and post-judgment interest;

C.    An award of reasonable attorneys' fees and costs incurred in prosecuting this action; and

D.    All further relief as the Court deems just and equitable.

Respectfully submitted

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
*Attorneys for Plaintiffs*
340 Beakes St. Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
Dated: February 13, 2026         grant@hurwitzlaw.com

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

SANDRA HAYWARD,

    Plaintiff,                    Case No.

v.                              Hon.

PINECREST MEDICAL
CARE FACILITY,

    Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
*Attorneys for Claimant*
340 Beakes St., Suite 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

---

## **JURY DEMAND**

    Plaintiff Sandra Hayward, by and through her attorneys, HURWITZ LAW PLLC, hereby

demands a jury trial in the above-captioned matter for all issues so triable.

                              Respectfully submitted

                              HURWITZ LAW PLLC

                              */s/ Noah S. Hurwitz*
                              Noah S. Hurwitz (P74063)
                              Grant M. Vlahopoulos (P85633)
                              *Attorneys for Plaintiffs*
                              340 Beakes St. Ste. 125
                              Ann Arbor, MI 48104
                              (844) 487-9489
                              noah@hurwitzlaw.com
Dated: February 13, 2026             grant@hurwitzlaw.com

21